IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**ROY HUNT,**

    **Plaintiff,**

v.                                           Civil Action No. 3:21cv539

**P. McCABE,** *et al.*,

    **Defendants.**

## MEMORANDUM OPINION

Roy Hunt, a Virginia inmate proceeding *pro se*, filed this 42 U.S.C. § 1983 action.[1] The action is proceeding on Hunt's Second Particularized Complaint. (ECF No. 18.) By Memorandum Opinion and Order entered on January 23, 2023 the Court dismissed a number of Hunt's claims as improperly joined. (ECF Nos. 57, 58.) Thereafter, by Memorandum Opinion and Order entered on January 17, 2024, the Court dismissed Hunt's claims against Nurse Procice without prejudice because he failed to timely serve her. (ECF Nos. 96, 97.) By Memorandum Opinion and Order entered on January 23, 2024, the Court dismissed Hunt's claim against Armor Health Care without prejudice. (ECF Nos. 100, 101.)

---

[1] The statute provides, in pertinent part:

> Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

The following claims remain before the Court:

Claim One  In violation of Hunt's Eighth Amendment[2] right to adequate medical care:

(a) Medical Secretary Harlon and Nurse McCabe failed to provide Captain Bowls with accurate information about Hunt's boot profile which prevented Hunt from seeing an endocrinologist for his thyroid. (ECF No. 18 ¶¶ 26, 27(a).)[3]

(b) Additionally, "Nurse McCabe never set a new appointment for plaintiff to go to Virginia Commonwealth University Hospital so could he start treatment on his thyroid." (ECF No. 18 ¶ 27(a).)

(c) Nurse McCabe failed to ensure that Hunt received his thyroid medication. (ECF No. 18 ¶ 27(a).)

Claim Two  Medical Secretary Harlon denied Hunt adequate medical care by repeatedly refusing to place Hunt on the master pass list to see nurses or doctors. (ECF No. 18 ¶ 26.) "Nurse McCabe refused [to put Hunt] on the sick call list to see the doctor numerous times that caused" Hunt's thyroid condition to get worse. (ECF No. 18 ¶ 27(a).)

The matter is before the Court on the Motions for Summary Judgment filed by Defendants Harlon and McCabe (ECF Nos. 68, 72). Defendant Harlon provided Hunt with appropriate *Roseboro* notice.[4] (ECF No. 70.) Although Defendant McCabe failed to provide Hunt with *Roseboro* notice, the Court provided Hunt with that notice by Memorandum Order entered on November 16, 2023. (ECF No. 95.) For the reasons set forth below, Harlon's Motion

---

[2] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

[3] Hunt spelled this Defendant's name as Halom, but the correct spelling is Harlon. (ECF No. 68, at 1 n.1.) The Court employs Harlon to refer to this Defendant. The parties employ different spellings for the name of Captain Bowles. For consistency sake, the Court employs the spelling "Bowles". The Court employs the pagination assigned by CM/ECF. The Court corrects the spelling, punctuation, and capitalization in the quotations from the parties' submissions.

Hunt includes two paragraphs numbered 27 in his Second Particularized Complaint. The second paragraph number 27 comes after paragraph number 28. The Court refers to the first paragraph 27 as ¶ 27(a) and the second paragraph as ¶ 27(b).

[4] *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975).

2

for Summary Judgment (ECF No. 68) will be GRANTED and McCabe's Motion for Summary Judgment (ECF No. 72) will be GRANTED IN PART and DENIED IN PART.

## I. Standard for Summary Judgment

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility of informing the Court of the basis for the motion and identifying the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c), (e) (1986)).

In reviewing a summary judgment motion, the Court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). A mere "*scintilla* of evidence," however, will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting *Munson*, 81 U.S. at 448). The Court is tasked with assessing whether Perry "has proffered sufficient proof, in the form of *admissible* evidence, that

3

could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added).

In support of their Motions for Summary Judgment, Defendants Harlon and McCabe submitted their own affidavits and Hunt's institutional and medical records, that the Court refers to by the CM/ECF designation. Hunt responded by submitting his own declarations and institutional and medical records which the Court refers to by their CM/ECF designation.

In light of the foregoing submissions and principles, the following facts are established for purposes of the Motion for Summary Judgment. All reasonable inferences are drawn in favor of Hunt.

## II. Relevant Facts

Hunt was confined at Nottoway Correctional Center between June 23, 2015 and January 8, 2021. (ECF No. 74 ¶¶ 26, 28.) In 2019, Harlon was an Office Service Assistant at Nottoway Correctional Center. (ECF No. 69-1 ¶ 1.) Currently, Harlon is a Program Support Technician in the Medical Department. (ECF No. 69-1 ¶ 1.) Nurse McCabe was one of the two nursing supervisors at Nottoway Correctional Center during the time Hunt was confined there. (ECF No. 74 ¶¶ 2, 9.)

### A. Lack of Boot Profile and Failure to Attend October 3, 2019 Appointment

After going to the hospital on August 2, 2019, Hunt was diagnosed with "Graves disease, 'Hyper Thyroid.'" (ECF No. 79 ¶ 4.) Thereafter, Hunt was returned to Nottoway Correctional Center. (ECF No. 79 ¶ 5.) Hunt was informed that he would need medication and iodine radiation treatment as soon as possible. (ECF No. 79 ¶ 6.)

On October 3, 2019, Hunt was scheduled "to be sent to Virginia Commonwealth University Hospital to see the Endocrinology [Department] and start [his] first treatment of iodine radiation treatment for his thyroid." (ECF No. 78-1 ¶ 5.) Per Virginia Department of

4

Corrections ("VDOC") policy, inmates are required to wear step-in shoes to outside appointments, instead of boots. (ECF No. 78-1 ¶ 6.) Hunt, however, refused to change into the step-in shoes because he claimed he had "boot profile" which permitted him to wear boots to outside appointments. (ECF No. 78-1 ¶¶ 6, 8.)

Captain Bowles contacted the medical department to ascertain whether Hunt had a boot profile. (ECF No. 78-1 ¶ 7.) Thereafter, Captain Bowles told Hunt he had "talked to Secretary Harlon and Nurse McCabe [and] they informed him there was no boot profile in [Hunt's] medical record" and Hunt could not wear boots to the outside appointment. (ECF No. 78-1 ¶¶ 7, 8.) Hunt insisted he could not wear the step-in shoes. (ECF No. 78-1 ¶ 8.) Captain Bowles told Hunt he could not go to his medical appointment. (ECF No. 78-1 ¶ 8.) When Hunt returned to the medical department, "Secretary Harlon and Nurse McCabe came [and] informed [him] that there was no boot profile in [his] medical record." (ECF No. 78-1 ¶ 9.) On October 3, 2019, K. Woodson wrote a note in Hunt's medical records reflecting:

> Offender refused MCV Endocrinology clinic follow up visit. Offender submitted an Emergency Grievance stating he is supposed to wear special shoes to his appointment. Offender's medical file was reviewed and no order for any type of special shoes was written. . . . NP Bendall [was] made aware that offender has refused his medical appointment.

(ECF No. 87-1, at 1.)[5]

"Boot profiles, such as the one referenced by Mr. Hunt in the Complaint, are valid for 12 months and must thereafter be renewed." (ECF No. 74 ¶ 6.) Pursuant to his request, Hunt was seen in the Medical Department on October 15, 2019. (ECF No. 74 ¶ 7.) Hunt was seen by Dr.

---

[5] Hunt insists that he did not truly refuse to attend his external endocrinology appointment. (ECF No. 78-1 ¶¶ 17, 18.) Hunt insists that, if he had refused to attend the appointment, there would be a refusal form in his chart and there is none. (ECF No. 78-1 ¶¶ 17, 18; ECF No. 78-4, at 1.)

5

Kazlaukas and informed Dr. Kazlaukas that, four years earlier, a doctor wrote an excuse for use of boots with transportation. (ECF No. 74 ¶ 8.) Dr. Kazlaukas reviewed Hunt's charts and noted that Hunt had been provided with arch supports in 2016. (ECF No. 74 ¶ 8.) Dr. Kazlaukas reordered the arch supports. (ECF No. 74 ¶ 8.) Dr. Kazlaukas "did not provide a boot profile allowing Hunt to wear boots outside of the facility." (ECF No. 74 ¶ 8.) Hunt does not and did not have an order permitting him to wear boots to outside appointments. (ECF No. 87-3, at 1.)

Harlon does not recall talking to Captain Bowles about a boot profile for Hunt. (ECF No. 69-1 ¶ 4.) Harlon swears that had Captain Bowles or any other security staff contacted him about Hunt's medically required footwear, he "would have taken Hunt's chart to a nurse or doctor to make the decision on footwear." (ECF No. 69-1 ¶ 4.)

### B.  The Failure to Reschedule the Iodine Radiation Treatment

On January 8, 2021, Hunt was transferred to Greensville Correctional Center ("Greensville"). (ECF No. 79 ¶ 17.) Between October 3, 2019, and January 8, 2021, Hunt was never rescheduled to receive his Iodine Radiation Treatment. (ECF No. 79 ¶ 17.)

Hunt's medical chart from January 30, 2020, reflects that Hunt urgently needed a follow up appointment with Virginia Commonwealth University regarding his thyroid. (ECF No. 87-8, at 2 ("F/U Thyroid, Needs App't w/ VCU Endocrinology ASAP").) On March 11, 2020, Hunt submitted an informal complaint wherein he noted that he had never been rescheduled to go back to the hospital for his Graves disease and he continued to lose weight and become sicker. (ECF No. 18-1, at 20.) Nurse McCabe responded and stated that, according to his chart, Hunt had refused his October 3, 2019 visit. (ECF No. 18-1, at 20.) Nurse McCabe informed Hunt that if wanted to be seen by an endocrinologist, he would have to submit a sick call slip and start the process over. (ECF No. 18-1, at 20.)

6

Hunt then submitted a regular grievance wherein he first noted that he had not refused his October 3, 2019 medical visit, but that the medical department provided false information about his boot profile. (ECF No. 18-1, at 21.) Next, Hunt stated that:

> The fact is I sign up for sick call on numerous times. On 10-15-19, 11-30-19, 2-11-20 and 3-13-20, I saw the doctor who ordered me to be sent back to the hospital because my condition [has] gotten worse. 3-13-20, I was seen by the doctor on emergency issue of my thyroid because I was so weak, lightheaded, and vomit that the officers ordered I go to medical and be seen by the doctor, who again ordered I needed to be seen by my doctors at the hospital.

(ECF No. 18-1, at 21.) Hunt requested "[t]o be taken to the hospital so I can be treated." (ECF No. 18-1, at 21.)

Although Hunt was never returned to VCU during his time at Nottoway Correctional Center, he did have some telemedicine appointments with VCU endocrinology after the cancelled October 3, 2019 appointment. (*See* ECF No. 86-1, at 9; ECF No. 87-5, at 1.) When Hunt arrived at Greensville, he was sent to see his endocrinology doctor. (ECF No. 78-1 ¶ 14.) The doctor informed Hunt that his "thyroid was at the worst stage" and "[t]he only way to fix the problem [was] to remove the thyroid due to [the fact that Hunt] never received the iodine radiation treatment that would have shr[u]nk the thyroid, 'repair the thyroid.'" (ECF No. 78-1 ¶ 14.)

### C. Provision of Thyroid Medication

After his August 2, 2019 visit to the hospital, where he was diagnosed with hyperthyroidism, Hunt was prescribed medication for that ailment. (ECF No. 79 ¶ 4.) On August 27, 2019, Hunt submitted an informal complaint wherein he noted that his thyroid medication had lapsed, and that his nausea had returned. (ECF No. 18-1, at 28.) On September 11, 2019, Nurse McCabe responded that his medication orders had changed and he would be getting a new self-medication chart. (ECF No. 18-1, at 28.)

Following the aborted October 3, 2019 VCU endocrinology appointment, Hunt stopped by the pill window in the Medical Department "to renew [his] chronic medication and to see the doctor." (ECF No. 79 ¶ 10.) Hunt was not issued a renewal of his endocrinology medicine. (ECF No. 79 ¶ 10.)

In her affidavit, Nurse McCabe swears that her review of Hunt's chart reflects that Hunt regularly received doses of his hyperthyroid medication between April 10, 2020 and October 15, 2020. (ECF No. 74 ¶¶ 29–36.)[6] According to McCabe's affidavit, Hunt's hyperthyroid medication was then renewed on November 24, 2020 for thirty days. (ECF No. 74 ¶ 36.) Thus, according to McCabe's affidavit there appears to be a one-month period between October 15, 2020 and November 24, 2020, when Hunt was not receiving his hyperthyroid medication and another period after December 24, 2020 when his medication lapsed.[7] On November 23, 2020, Hunt submitted an emergency grievance wherein he stated:

> For over a week, I have been trying to get my chronic medication refilled. On the other shift, I wasn't able because of not calling self med. When I did get the order in, I'm not being able to pick up my medication. Now being told I have to get my med[ication] when the next shift come in. I need to pick up my medication.

(ECF No. 81-12, at 1.) Staff responded, "submit a nurse sick call\request and your meds will be delivered to you." (ECF No. 81-12, at 1.)

---

[6] On September 15, 2020, Hunt submitted an emergency grievance wherein he complained that his thyroid medication had run out and indicated his pod was not called to pill call. (ECF No. 86-1, at 22.) Staff responded that day and stated "called offender over" and "gave requested medications." (ECF No. 86-1, at 22.)

[7] In her Reply, McCabe directs that Court to other medical records which she asserts reflect that Hunt received his hyperthyroid medication between October 22, 2019 and April 15, 2020. (ECF No. 87, at 4–5.)

8

On December 28, 2020, Hunt submitted an Offender Request noting that he needed his thyroid medication. (ECF No. 81-13, at 1.) Staff responded that his medication had expired and that he needed to submit a sick call for a renewal of his medication. (ECF No. 81-13, at 1.)

### D. Relevant Medical Procedures at Nottoway

#### 1. Sick Call and Inmate Scheduling

Nurse McCabe explains that:

> Patients who wanted to submit a sick call request would do so during the 3 p.m. pill call. The patient would advise the nurse at the pill call window that he wanted to be seen. The nurse would place the patient on a list. These patients would then be seen that evening between 6 and 9:30 p.m. by the nurse on duty. The nurse would then screen the patient. If the nurse believed the patient needed to be seen by a physician or nurse practitioner, then his file would be placed in the "to be seen" pile for the next day.

(ECF No. 74 ¶¶ 10, 11 (paragraph structure and paragraph numbers omitted).) Hunt was seen on sick call numerous times, including on March 1, 2020, March 9, 2020, April 5, 2020, April 20, 2020, May 15, 2020, and September 21, 2020. (ECF No. 87-7, at 1–5; ECF No. 87-10, at 3.)

Nurse McCabe worked from 5 a.m. to 1:30 p.m. (ECF No. 73-1 ¶ 9.) The second nursing supervisor worked from 9:00 a.m. to 5:30 p.m. (ECF No. 73-1 ¶ 9.) Nurse McCabe swears that she was not involved in sick call requests or scheduling and had no power to block Hunt from being seen during sick call. (ECF No. 73-1 ¶ 12.)

Nurse McCabe, however, did respond to Hunt's August 5, 2020 Informal Complaint wherein he complained that he signed up sick for call and the nurse had ordered that he see the doctor. (ECF No. 86-1, at 21.) Hunt further noted that although his blood was taken, and he was informed that he would see Dr. York on July 25, 2020, he was not seen by Dr. York. (ECF No. 86-1, at 21.) Since that date, Hunt had signed up for sick call three more times and still had not

9

been seen. (ECF No. 86-1, at 21.) On August 11, 2020, Nurse McCabe responded, "You are scheduled to the see the health care provider shortly." (ECF No. 86-1, at 21.)[8]

Harlon swears that although he schedules eye appointments, he does not schedule other medical appointments or place inmates on the list to be seen by medical professionals. (ECF No. 69-1 ¶ 5.) Harlon swears that he never took any action to deny Hunt access to medical care. (ECF No. 69-1 ¶ 6.)

### 2. **Provision of Medications**

As a registered nurse, Nurse McCabe cannot unilaterally order medications. (ECF No. 74 ¶ 13.) He may do so under the written direction of a doctor. (ECF No. 74 ¶ 13.) As a Registered Nurse, Nurse McCabe did not "have the authority to order or reorder thyroid medication for [Hunt]." (ECF No. 74 ¶ 17.) The provisions for ordering medications at Nottoway is as follows:

> The usual practice for entering a medication order is for the nurse that notes a doctor's order to be the nurse who enters the order. The only time that [Nurse McCabe] would enter a medication order would be where [he] had worked as the doctor's nurse and had noted the encounter. [Nurse McCabe] did not work as a nurse for a doctor who treated Plaintiff during his time at Nottoway Correctional Center.
> . . .
> If a medication order comes from a physician outside of the facility, the order is treated as a recommendation for the Department of Corrections provider to use if he or she deems necessary for the offender's health. If the medication order is received during normal business hours, when the physician is on-site, the paperwork from the outside appointment would be given to the doctor's nurse to give to the doctor. The doctor would then review the medical chart and the current recommendations and write a doctor's note listing what needs to be ordered. The doctor's nurse would then note the order and enter these new orders in the computer system for the pharmacy to fill prescriptions. If the medication order is received

---

[8] Hunt's medical record reflects that on July 24, 2020, Dr. York had directed that Hunt's "labs" be sent "to VCU Endocrinology." (ECF No. 87-9, at 2.) It appears that medical staff carried out that request on July 27, 2020. (ECF No. 87-9, at 2.) On August 11, 2020, Dr. York directed medical staff to ensure that Hunt had a follow-up with VCU endocrinology in four weeks and "labs in 3 wks." (ECF No. 87-9, at 3.) On August 13, 2020, Dr. York noted that Hunt's labs had been reviewed and he would discuss them with Hunt at his next visit. (ECF No. 87-9, at 3.)

10

after-hours or on weekends or holidays, the paperwork is given to a nurse. The nurse would then speak by phone with the on-call doctor, who is a Department of Corrections provider. The nurse would read the recommendations to the on-call doctor and answer the doctor's questions with information available in the offender's medical chart. The on-call doctor would then give the nurse any new orders that he or she deems appropriate, based on this information.

The nurse would write these phone orders into the chart, note the orders, and enter the orders in the computer system for the pharmacy. The medical chart would then be placed in the file cabinet for the on-site doctor to review the next business day when he/she returns to work. This doctor may then either co-sign the on-call doctor's telephone orders as written or modify these orders as deemed necessary. If the telephone orders are changed, the doctor would then hand the medical chart to the nurse to note the new orders and enter them into the computer system to be handled as above.

(ECF No. 74 ¶¶ 14–16, 18–25 (paragraph structure altered, paragraph numbers omitted).)

### III. Analysis

To survive a motion for summary judgment on an Eighth Amendment claim, a plaintiff must demonstrate: "(1) that objectively the deprivation of a basic human need was 'sufficiently serious,' and (2) that subjectively the prison officials acted with a 'sufficiently culpable state of mind.'" *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). With respect to claims of inadequate medical treatment under the Eighth Amendment, "the objective component is satisfied by a serious medical condition." *Quinones*, 145 F.3d at 167. A medical need is "serious" if it "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)); *see Webb v. Hamidullah*, 281 F. App'x 159, 165 (4th Cir. 2008) (citing *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)).

The subjective prong of an Eighth Amendment claim requires the plaintiff to demonstrate that a particular defendant actually knew of and disregarded a substantial risk of serious harm to his person. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference is a very

11

high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. *Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Quinones*, 145 F.3d at 168 (citing *Farmer*, 511 U.S. at 837); *see Rich v. Bruce*, 129 F.3d 336, 338 (4th Cir. 1997). Thus, to survive a motion for summary judgment under the deliberate indifference standard, a plaintiff "must show that the official in question subjectively recognized a substantial risk of harm. . . . [and] that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997)).

In evaluating a prisoner's complaint regarding medical care, the Court is mindful that "society does not expect that prisoners will have unqualified access to health care" or to the medical treatment of their choosing. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Estelle*, 429 U.S. at 103–04). In this regard, the right to medical treatment is limited to that treatment which is medically necessary and not to "that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977).

### A.   <u>The Boot Profile</u>

Hunt contends that Nurse McCabe and Harlon acted with deliberate indifference by falsely telling Captain Bowles that Hunt did not have a boot profile, which prevented Hunt from attending his endocrinology appointment. The record, however, reflects Hunt did not have a

12

current boot profile or any medical order which permitted him to attend off-site medical appointments in boots. Accordingly, Hunt fails to demonstrate that he had a serious medical need to attend off-site medical appointment in boots. Further, nothing in the record suggests that Nurse McCabe or Harlon were subjectively aware that providing accurate information about Hunt's lack of a boot profile would pose a substantial risk of serious harm to Hunt's person. Finally, the record demonstrates Hunt's failure to attend the outside endocrinology appointment is attributable to Hunt's failure to change into proper footwear rather than any unconstitutional conduct on behalf of Nurse McCabe or Harlon. Accordingly, Claim 1(a) will be DISMISSED.

### B. Rescheduling Hunt for Attending Outside Treatment for Hyperthyroidism and the Provision of Hyperthyroid Medication

Nurse McCabe did not address Claim 1(b), regarding rescheduling Hunt's thyroid treatment at VCU, is his Memorandum in Support of Summary Judgment. Without any explanation, for the first time in his Reply, Nurse McCabe acknowledges this claim and provides a cursory argument for its dismissal.[9] The Court is neither obliged nor inclined to address arguments for summary judgment raised in this fashion. *See Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1164 (10th Cir. 1998) (concluding that when a district court is confronted with new arguments for dismissal in a reply brief it may permit nonmovant to file a surreply or refrain from relying on the material); *see also Segin Sys., Inc. v. Stewart Title Guar. Co.*, 30 F. Supp. 3d 476, 483 (E.D. Va. 2014) (observing that the "ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered." (quoting

---

[9] It can sometimes be difficult for a defendant to distill the precise claims made by *pro se* a plaintiff and thus not squarely address the claims in the dispositive motions. Nurse McCabe faced no such difficulty here because the January 23, 2023 Memorandum Opinion listed the precise claims Hunt had brought against him. (ECF No. 57, at 5.) Nurse McCabe simply failed to address Claims 1(b) and 1(c) in his Memorandum in Support of the Motion for Summary Judgment.

13

*Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006))). Accordingly, to the extent that Nurse McCabe seeks summary judgment with respect to Claim 1(b), the Motion will be DENIED.

In Claim 1(c), Hunt faults Nurse McCabe for failing to ensure that Hunt received his thyroid medication. In his Memorandum in Support of the Motion for Summary Judgment, McCabe provides some facts relevant to the distribution of Hunt's medication, but no argument as to why this claim should be dismissed. Again, Nurse McCabe waited until filing his Reply to argue why this claim should be dismissed.[10] As explained previously, this sort of belated argument for dismissal will not be considered. Nurse McCabe's Motion for Summary Judgement with respect to Claim 1(c) will be DENIED WITHOUT PREJUDICE.

C. **Refusing to Place Hunt on the List to See the Doctor**

Hunt contends that both Harlon and Nurse McCabe refused to put him on the list to see the doctor. However, the undisputed evidence reflects that Harlon was not involved with putting inmates on the list to see the doctor. Rather, the primary responsibility for placing inmates on the sick call list to see the doctor fell to nurse on duty between 6 and 9:30 p.m. in the evening, who would screen the inmates who had requested to see the doctor at pill call that day. Nurse McCabe was not involved in screening sick call requests and did not block Hunt from seeing the doctor. At best, the record reflects that Nurse McCabe responded to Hunt's August 5, 2020 Informal Complaint and ensured that he was scheduled to see the doctor. Hunt fails to demonstrate that either Harlon or Nurse McCabe acted with deliberate indifference to Hunt's desire to see the institutional doctor. Accordingly, Claim 2 will be DISMISSED.

---

[10] Without any explanation for its belated presentation, McCabe also provided additional evidence regarding the provision of medication to Hunt.

## IV. Conclusion

Harlon's Motion for Summary Judgment (ECF No. 68) will be GRANTED. McCabe's Motion for Summary Judgment (ECF No. 72) will be GRANTED IN PART and DENIED IN PART. Claims 1(a) and Claim 2 will be DISMISSED. Hunt and Nurse McCabe will be ORDERED to participate in a settlement conference with respect to Claims 1(b) and 1(c). The settlement conference and proceedings will be REFERRED to the Honorable Summer Speight, United States Magistrate Judge, to conduct a settlement conference. Hunt and counsel for McCabe shall await further instructions on scheduling the conference from Judge Speight. McCabe shall abide by whatever further instructions or requirements Judge Speight may impose.

An appropriate Order will accompany this Memorandum Opinion.

Date: 1/26/2024  
Richmond, Virginia

/s/  
M. Hannah Lauck  
United States District Judge

15