IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

ROY HUNT,

      Plaintiff,

v.                                      Civil Action No. 3:21cv539

P. McCABE, *et al.*,

      Defendants.

## MEMORANDUM OPINION

Roy Hunt, a Virginia inmate proceeding *pro se*, filed this 42 U.S.C. § 1983 action.[1] The action is proceeding on Mr. Hunt's Second Particularized Complaint. (ECF No. 18.) The matter is before the Court on the Supplemental Motion for Summary Judgment filed by Nurse McCabe. (ECF No. 124.) Nurse McCabe is the only Defendant remaining before the Court. For the reasons set forth below, the Supplemental Motion for Summary Judgment, (ECF No. 124), will be GRANTED.

## I.  Pertinent Procedural History

Nurse McCabe is the only Defendant remaining before the Court. By Memorandum Opinion and Order entered on January 23, 2023, the Court dismissed a number of Mr. Hunt's claims as improperly joined. (ECF Nos. 57, 58.) As such, by Memorandum Opinion and Order

---

[1] The statute provides, in pertinent part:

> Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

entered on January 17, 2024, the Court dismissed Mr. Hunt's claims against Nurse Procice

without prejudice because he failed to timely serve her.  (ECF Nos. 96, 97.)  By Memorandum

Opinion and Order entered on January 23, 2024, the Court dismissed Mr. Hunt's claim against

Armor Health Care without prejudice.  (ECF Nos. 100, 101.)  After that decision, the following

claims remained before the Court:

<table>
<tr><td>Claim 1</td><td>In violation of Mr. Hunt's Eighth Amendment[2] right to adequate medical care:</td></tr>
<tr><td></td><td>(a) Medical Secretary Harlon and Nurse McCabe at Nottoway Correctional Center failed to provide Captain Bowls with accurate information about Mr. Hunt's boot profile which prevented Mr. Hunt from seeing an endocrinologist for his thyroid.  (ECF No. 18 ¶¶ 26, 27(a).)[3]</td></tr>
<tr><td></td><td>(b) Additionally, "Nurse McCabe never set a new appointment for plaintiff to go to Virginia Commonwealth University Hospital so could he start treatment on his thyroid."  (ECF No. 18 ¶ 27(a).)</td></tr>
<tr><td></td><td>(c)  Nurse McCabe failed to ensure that Mr. Hunt received his thyroid medication.  (ECF No. 18 ¶ 27(a).)</td></tr>
<tr><td>Claim 2</td><td>Medical Secretary Harlon denied Mr. Hunt adequate medical care by repeatedly refusing to place Mr. Hunt on the master pass list to see nurses or doctors.  (ECF No. 18 ¶ 26.)  "Nurse McCabe refused [to put Mr. Hunt] on the sick call list to see the doctor numerous times that caused" Mr. Hunt's thyroid condition to get worse.  (ECF No. 18 ¶ 27(a).)</td></tr>
</table>

---

[2] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.

[3] Mr. Hunt spelled this Defendant's name as Halom, but the correct spelling is Harlon. (ECF No. 68, at 1 n.1.)  The Court employs Harlon to refer to this Defendant.

The Court employs pagination assigned by CM/ECF.  The Court corrects the spelling, capitalization, and punctuation in the quotations from the parties' submissions.  The Court omits any secondary citations in citations to the parties' submissions.

Mr. Hunt includes two paragraphs number 27 in his Second Particularized Complaint. The second paragraph number 27 comes after paragraph number 28.  The Court refers to the first paragraph 27 as ¶ 27(a) and the second paragraph as ¶ 27(b).

By Memorandum Opinion and Order entered on January 26, 2024, the Court dismissed Claims

1(a) and 2. (ECF Nos. 102, 103.)  The Court declined to entertain Nurse McCabe's request for

summary judgment with respect to Claims 1(b) and 1(c), because he waited until his Reply to

raise arguments and present evidence seeking the dismissal of those claims. (ECF No. 102, at

13–14.)  By Memorandum Order entered on April 22, 2024, the Court granted Nurse McCabe

leave to file a renewed motion for summary judgment with respect to those claims. (ECF

No. 121.)

On May 6, 2024, Nurse McCabe filed his Supplemental Motion for Summary Judgment.

(ECF No. 124.)  Nurse McCabe provided Mr. Hunt with appropriate *Roseboro*[4] Notice.  (ECF

No. 126.)  On June 24, 2024, Mr. Hunt provided his belated response.  (ECF Nos. 132–34.)

## II. Standard for Summary Judgment

Summary judgment must be rendered "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a).  The party seeking summary judgment bears the responsibility of informing the

Court of the basis for the motion and identifying the parts of the record which demonstrate the

absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive

issue, a summary judgment motion may properly be made in reliance solely on the pleadings,

depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation

marks omitted).  When the motion is properly supported, the nonmoving party must go beyond

the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and

---

[4] *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975).

admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c), (e) (1986)).

In reviewing a summary judgment motion, the Court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Whether an inference is reasonable or justifiable must be considered in conjunction with competing inferences to the contrary. *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 818 (4th Cir. 1995). A mere "*scintilla* of evidence," however, will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting *Munson*, 81 U.S. at 448). The Court is tasked with assessing whether Mr. Hunt "has proffered sufficient proof, in the form of *admissible* evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added).

In support of his Supplemental Motion for Summary Judgment, Nurse McCabe submitted his own affidavits and Mr. Hunt's medical records, that the Court refers to by their CM/ECF designation. Mr. Hunt has responded to the Supplemental Motion for Summary Judgment with his own declaration, his medical records, and some prison correspondence.[5]

But the facts offered by an affidavit or sworn declaration must be in the form of admissible evidence. *See* Fed. R. Civ. P. 56(c)(4). In this regard, the sworn statement "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that

---

[5] The Court will refer to these documents by their CM/ECF designation.

the affiant or declarant is competent to testify on the matters stated." *Id.* Therefore, "summary judgment affidavits cannot be conclusory or based upon hearsay." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (internal citations omitted). Mr. Hunt has submitted a number of sworn statements that run afoul of this prohibition against hearsay and cannot be considered on summary judgment. For example, Mr. Hunt swears that, after he left the care of Nurse McCabe and was transferred to Greensville Correctional Center ("Greensville"), his endocrinology doctor informed him that his "thyroid was at the worst stage" and "[t]he only way to fix the problem [was] to remove the thyroid due to [the fact that Mr. Hunt] never received the iodine radiation treatment that would have shr[u]nk the thyroid, 'repair the thyroid.'" (ECF No. 78-1 ¶ 14.) Similarly, Mr. Hunt swears that, "[w]hile I was housed at Nottoway, the head doctor of Nottoway saw my thyroid conditions was getting wors[e], [he] informed me he spoke[] to my thyroid doctors at the hospital who felt I needed to be personally and physically seen so I could be treated." (ECF No. 132 ¶ 11.) Hearsay statements like this will not be considered in resolving the Supplemental Motion for Summary Judgment.

Mr. Hunt's "'[a]iry generalities, conclusory assertions and hearsay statements [do] not suffice' to stave off summary judgment . . . because none of these [are] admissible evidence at an evidentiary hearing." *United States v. Roane*, 378 F.3d 382, 400–01 (4th Cir. 2004) (first and second alteration in original) (citation omitted). Thus, when Nurse McCabe provides specific dates regarding when thyroid medications or other medical attention was or was not provided to Mr. Hunt, Mr. Hunt must respond and dispute those specific facts.[6] Mr. Hunt cannot create a genuine dispute of fact by his airy generality that:

---

[6] The Court notes that Mr. Hunt, unlike Nurse McCabe, made no effort to comply with Local Civil Rule 56(B). That Rule required Mr. Hunt to include in his response to Nurse McCabe's Supplemental Motion for Summary Judgment "a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be

> Numerous times I went weeks up to a month not receiving the refill or getting my thyroid medication renewed after going to the pill window to retrieve my medication or seeing the doctor to renew my medication. I did not receive my medication; therefore I filed emergency grievance and informal complaint seeking assistance of me getting my thyroid medication or seeing the doctor. Nurse Supervisor McCabe responded to informal complaint, "sign up for sick call," which I did and never gotten the medication or was seen.

(ECF No. 132 ¶ 9.)

In light of the foregoing submissions and principles, the following facts are established for purposes of the Supplemental Motion for Summary Judgment. All reasonable inferences are drawn in favor of Mr. Hunt.

### III.  Relevant Facts

Mr. Hunt was confined at Nottoway Correctional Center ("Nottoway") between June 23, 2015, and January 8, 2021. (ECF No. 125-2 ¶¶ 5, 58.) Nurse McCabe was one of the two Supervising Nurses at Nottoway during the time Mr. Hunt was confined there. (ECF No. 125-2 ¶ 2.) All of Mr. Hunt's remaining claims stem from facts and circumstances arising out of his incarceration at Nottoway. The Court views the evidence and all reasonable or justifiable inferences in favor of Mr. Hunt.

### A.   Mr. Hunt's Initial Diagnosis and the October 3, 2019 Medical Appointment

After going to the hospital on August 2, 2019, Mr. Hunt was diagnosed with "Graves disease, 'Hyper Thyroid.'" (ECF No. 79 ¶ 4.) Mr. Hunt was "placed on medication to control the thyroid which [he] was informed [he] would have to take . . . for the rest of [his] life." (ECF No. 79 ¶ 4.)

---

litigated and citing the parts of the record relied on to support the facts alleged to be in dispute." E.D. Va. Loc. Civ. R. 56(B). That failure permits the Court to "assume that facts identified by [Nurse McCabe] in [his] listing of material facts are admitted." E.D. Va. Loc. Civ. R. 56(B).

On August 3, 2019, Mr. Hunt returned to Nottoway with a diagnosis of hyperthyroidism. (ECF No. 125-2 ¶ 6.)  On August 4, 2019, a provider at Nottoway evaluated the medication provided for Mr. Hunt's thyroid treatment.  (ECF No. 125-2 ¶ 7.)  On August 27, 2019, Mr. Hunt's prescription for Tapazole was renewed.  (ECF No. 125-2 ¶ 8.)

On October 3, 2019, Mr. Hunt was scheduled "to be sent to Virginia Commonwealth University Hospital to see the Endocrinology [Department] and start [his] first treatment of iodine radiation treatment for [his] thyroid."  (ECF No. 78-1 ¶ 5.)  Per Virginia Department of Corrections ("VDOC") policy, inmates are required to wear step-in shoes to outside appointments, instead of boots.  (ECF No. 78-1 ¶ 6.)  Mr. Hunt, however, refused to change into the step-in shoes because he claimed he had "boot profile" which permitted him to wear boots to outside appointments.  (ECF No. 78-1 ¶¶ 6, 8.)  As discussed fully in the January 17, 2024 Memorandum Opinion, Mr. Hunt did not have a current boot profile which permitted him to wear boots to outside medical appointment.  (ECF No. 102, at 4–6, 12–13.)  Mr. Hunt did not attend the outside medical appointment because he failed to change into the proper footwear. (ECF No. 102, at 13.)

On October 3, 2019, K. Woodson wrote a note in Mr. Hunt's medical records reflecting, in pertinent part:

> Offender refused MCV Endocrinology clinic follow up visit.  Offender submitted an Emergency Grievance stating he is supposed to wear special shoes to his appointment.  Offender's medical file was reviewed and no order for any type of special shoes was written. . . . NP Bendall [was] made aware that offender has refused his medical appointment.

(ECF No. 87-1, at 1.)

**B.     COVID-19 and Mr. Hunt's Endocrinology Visits**

Between October 3, 2019, and January 8, 2021, Mr. Hunt was never rescheduled by

Nottoway officials to receive his Iodine Radiation Treatment.[7]  (ECF No. 79 ¶ 17.)

Mr. Hunt's medical chart from January 30, 2020, reflects that Mr. Hunt needed a follow-

up appointment with Virginia Commonwealth University ("VCU") regarding his thyroid.  (ECF

No. 87-8, at 2 ("F/U Thyroid, Needs App't w/ VCU Endocrinology ASAP").)

On March 11, 2020, Mr. Hunt submitted an informal complaint wherein he stated:

> Months ago, I was told I would be sent back to the hospital for my Graves
> disease.  It's been months and I continue to get sick, shaking, lightheaded, weak,
> vomiting, and losing weight.  I talked to other inmates who went to the hospital and
> [they] informed me they was issued to go by the doctors a month ago, months after
> I was told.

(ECF No. 18-1, at 20.)  Nurse McCabe responded and stated that, according to his chart, Mr.

Hunt had refused his October 3, 2019 visit.  (ECF No. 18-1, at 20.)  Nurse McCabe informed Mr.

Hunt that if he wanted to be seen by an endocrinologist, he would have to submit a sick call slip

and start the process over.  (ECF No. 18-1, at 20.)[8]

---

[7] On January 8, 2021, Mr. Hunt was transferred to Greensville.  (ECF No. 79 ¶ 17.)

[8] On or about March 20, 2020, Mr. Hunt submitted a regular grievance wherein he first
noted that he had not refused his October 3, 2019 medical visit, but that the medical department
provided false information about his boot profile.  (ECF No. 18-1, at 21.)  Next, Mr. Hunt stated:

> Then McCabe stated I need to sign up for sick call and start over again.  The fact is
> I sign up for sick call on numerous times.  On 10-15-19, 11-30-19, 2-11-20 and 3-
> 13-20, I saw the doctor who ordered me to be sent back to the hospital because my
> condition [had] gotten worse.  3-13-20, I was seen by the doctor on an emergency
> issue of my thyroid because I was so weak, lightheaded, and vomit that the officers
> ordered I go to medical and be seen by the doctor, who again ordered I need[ed] to
> be seen by my doctors at the hospital.

(ECF No. 18-1, at 21.)  Mr. Hunt requested "[t]o be taken to the hospital so I can be treated."
(ECF No. 18-1, at 21.)  It appears that this grievance may not have processed because it
contained multiple issues.  (ECF No. 18-1, at 21.)

On April 6, 2020, Mr. Hunt had a telemedicine visit with VCU Health regarding his thyroid treatment. (ECF No. 86-1 at 9.)[9] The record from that visit reflects "graves disease lab fu as appointment was cancelled give[n] covid 19 crisis." (ECF No. 86-1, at 9.) Nothing from the visit notes indicate the doctors at VCU Health believed, given Mr. Hunt's condition and the COVID-19 crisis, iodine treatment was appropriate at that time. (ECF No. 86-1, at 9.) Rather, the physician recommended to treat Mr. Hunt's thyroid disease with 20 mgs of methimazole daily, instead of 10 mgs of methimazole. (ECF No. 86-1, at 9.)

On August 11, 2020, Dr. York made a note in Mr. Hunt's file stating, "p/s [please] ensure offender has f/u [follow up] w/VCU endocrinology in 4 wks [weeks]." (ECF No. 134-5, at 1.)

On September 17, 2020, Mr. Hunt had another telemedicine visit with VCU Health. (ECF No. 87-5, at 1.) The notes from that visit do not indicate that Mr. Hunt should have been returned to VCU for iodine radiation treatment. (ECF No. 87-5, at 1.) Instead, the notes state "VCU recommended ok to give Tapnzole 30 mg (10 mg tabs) . . . daily." (ECF No. 87-5, at 1.) Further, the note from VCU Health states, "Will need to discuss definitive treatment options at future visits." (ECF No. 134-3, at 3.)

On November 19, 2020, Mr. Hunt had his final telemedicine visit with his endocrinologist at VCU Health while he was confined at Nottoway. (ECF No. 81-15, at 3.) The doctor's notes from that visit reflect, in pertinent part:

> **Assessment and Recommendations**
> 1) <u>Hyperthyroidism due to graves disease</u>
> he is unlikely to go into remission given high TRab, large gland size

---

[9] On April 9, 2020, Mr. Hunt submitted an informal complaint wherein he stated, "the report is false in my file that I saw the doctor 4-6-20 . . . ." (ECF No. 18-1, at 25.) On April 21, 2020, Nurse McCabe responded: "Thank you for letting medical know of your concerns. This information will be reviewed, and appropriate action taken." (ECF No. 18-1, at 25.)

In contravention to his informal complaint, Mr. Hunt has submitted a copy of his record of his April 6, 2020 VCU telemedicine visit. He has not suggested those records are inaccurate or false. (ECF No. 86-1, at 9.)

> also, he keeps coming on and off the methimazole.
> we have discussed RAI ablation / surgery with him in the past 1 yr ago
> and he was not interested
> I think in his situation – above is the best route
>    . . . .
> Recommend resuming methimazole . . . .
> Follow up in 1-2 months . . . .

(ECF No. 81-15, at 3.)

On November 30, 2020, Dr. York noted in Mr. Hunt's file, "needs Appt w/VCU endocrinology ASAP." (ECF No. 134-6, at 1.) Thereafter, Mr. Hunt was scheduled to have a telemedicine visit with VCU endocrinology on January 21, 2021. (ECF No. 134-7, at 1.)

On January 8, 2021, Mr. Hunt was transferred to Greensville. (ECF No. 79 ¶ 17.) On January 21, 2021, Mr. Hunt had another telemedicine visit with his endocrinologist. (ECF No. 18-1, at 85.) Although Mr. Hunt only provided six of the seven pages of the medical record for that visit, those pages do not reflect a change in his condition or the recommended treatment. (ECF No. 18-1, at 82–87.)

### C.    Provision of Thyroid Medication and Mr. Hunt's Pertinent Grievances

After his August 2, 2019 visit to the hospital, during which he was diagnosed with hyperthyroidism, Mr. Hunt was prescribed medication for that ailment. (ECF No. 79 ¶ 4.) On August 27, 2019, Mr. Hunt submitted an informal complaint wherein he noted that his thirty-day prescription for thyroid medication had lapsed, and that his nausea had returned. (ECF No. 18-1, at 28.) On that same date, Mr. Hunt's prescription for Tapazole was renewed. (ECF No. 125-2 ¶ 8.) On September 11, 2019, Nottoway's Nurse McCabe responded to Mr. Hunt's informal complaint and stated that his medication orders had changed, and he would be getting a new self-medication chart. (ECF No. 18-1, at 28.)

Following the aborted October 3, 2019 VCU endocrinology appointment, Mr. Hunt stopped by the pill window in the Medical Department "to renew [his] chronic medication and to

see the doctor." (ECF No. 79 ¶ 10.) Mr. Hunt was not issued a renewal of his endocrinology

medicine at that time. (ECF No. 79 ¶ 10.)

On October 15, 2019, Nottaway's Nurse McCabe received an informal complaint from

Mr. Hunt, wherein he stated:

> 10-3-19 I sign up for sick call informing the nurse to renew my thyroid meds
> and my thyroid which is chronic care. That night I was not called for being seen.
> The next day 10-4-19, during 9 pm count the officer informed me medical called
> for me, but I was in the shower, which after count was not allowed to go to medical.
> 10-7-19, I was sent a $5.00 copay of medical which I never was seen by medical
> and I [was] informed was for my thyroid "chronic care," and still need to be seen
> and my medication.

(ECF No. 18-1, at 14.) On October 17, 2019, Nottaway's Nurse McCabe responded:

> On 10-3-19, you signed up for sick call for not being able to eat. Also, on
> 10-3-19, you refused your MCV endocrinology clinic follow-up visit. The
> appointment refusal was where the $5 medical co-pay change was assessed.

(ECF No. 18-1, at 14.)

On December 1, 2019, Mr. Hunt submitted an informal complaint wherein he stated:

> For the past few weeks, I have been feeling bad which I been complaining.
> Today, after getting up I keep feeling light-headed and vomiting. These are some
> of the same symptoms I was suffering with when I was sent to the emergency room
> for my thyroid. I have complain[ed] to medical for months which I was to attend
> an appointment at the hospital until I was denied the visit because a lie that cause
> my visit and medical order [to] be denied.

(ECF No. 18-1, at 30.) On December 5, 2019, Nurse McCabe responded, "If you wish to be seen

by medical, please sign up for sick call at the pill window during evening meal time." (ECF

No. 18-1 at 30.)

On December 16, 2019, Mr. Hunt submitted another informal complaint reiterating his

complaint about feeling sick and stated that he had signed "up for sick call four times in two

months, but was never seen." (ECF No. 18-1, at 33.) On December 19, 2019, Nurse McCabe

responded, "There are no records of you being seen during sick call in your chart. Last entry was

10/29/2019 to discuss lab results. If you wish to be seen by medical, please sign-up for sick call at the pill window during evening meal time." (ECF No. 18-1, at 33.)

In his affidavit, Nottoway's Nurse McCabe swears that his review of Mr. Hunt's chart reflects that Mr. Hunt regularly received doses of his hyperthyroid medication, Methimazole, between October 22, 2019 and September of 2020. (ECF No. 125-2 ¶¶ 35–48.)[10] On September 15, 2020, Mr. Hunt submitted an emergency grievance wherein he complained that his thyroid medication had run out and indicated his pod was not called to pill call. (ECF No. 86-1, at 22.)[11] Staff responded that day and stated "called offender over" and "gave requested medications." (ECF No. 86-1, at 22.) On September 15, 2020, Mr. Hunt received a thirty-day supply of Methimazole for self-administration. (ECF No. 125-2 ¶ 48.) Nevertheless, on October 5, 2020, roughly twenty days later, while Mr. Hunt apparently still had a ten-day supply of Methimazole, Mr. Hunt received another thirty-day supply of Methimazole for self-administration. (ECF No. 125-2 ¶ 49.)

On November 23, 2020, Mr. Hunt submitted an emergency grievance wherein he stated:

> For over a week, I have been trying to get my chronic medication refilled. On the other shift, I wasn't able because of not calling self med. When I did get the order in, I'm not being able to pick up my medication. Now being told I have to get my med[ication] when the next shift come in. I need to pick up my medication.

(ECF No. 81-12, at 1.) Staff responded, "submit a nurse sick call\request and your meds will be delivered to you." (ECF No. 81-12, at 1.) On November 24, 2020, Mr. Hunt received a thirty-day supply of Methimazole for self-administration. (ECF No. 125-2 ¶ 50.)

---

[10] A justifiable inference can be drawn that there was a six or seven-day gap, between July 15, 2020 and July 22, 2020, when Mr. Hunt's medicine may have lapsed. (ECF No. 125-2 ¶¶ 45, 46.) That lapse, however, does not preclude the Court from granting summary judgment here.

[11] The notes from Mr. Hunt's September 17, 2020 telemedicine visit also indicate his thyroid medication ran out shortly before September 15, 2020. (ECF No. 134-3, at 1.)

While still in Nottoway, between December 5 and 7 of 2020, Mr. Hunt received Methimazole doses directly from the medical staff. (ECF No. 125-2 ¶ 51.) Apparently, Mr. Hunt's supply of Methimazole ran out sometime around the end of December of 2020. On December 29, 2020, Mr. Hunt submitted an Offender Request noting that he needed his thyroid medication. (ECF No. 81-13, at 1.) Staff responded that his medication had expired and that he needed to submit a sick call request for a renewal of his medication. (ECF No. 81-13, at 1.)

On December 29, 2020, Mr. Hunt submitted an informal complaint wherein he complained that a nurse had interfered with his ability to communicate with Dr. York about some undefined medical problem. (ECF No. 18-1, at 79.) On January 6, 2021, Nottoway's Nurse McCabe responded, "If you wish to be seen by medical, please sign up for sick call." (ECF No. 18-1, at 79.)

Mr. Hunt left Nottoway for transfer to Greensville on January 8, 2021. (ECF No. 125-2 ¶ 58.) Mr. Hunt's medical transfer forms reflect that he has Graves disease, but do not appear to have a current prescription for thyroid medication. (ECF No. 134-7, at 1; ECF No. 134-8, at 1.) On June 8, 2023, Mr. Hunt had "a total thyroidectomy." (ECF No. 132 ¶ 19.)

### D.   Nurse McCabe's Duties and Responsibilities

#### 1.   Outside Appointments

As a Supervising Nurse, Nottoway's Nurse McCabe's duties did not include scheduling inmate appointments with outside providers. (ECF No. 125-2 ¶ 10.)

> An inmate could only see an outside medical provider if the physician entered a note into the chart for an outside visit or consultation. If the physician entered a note for an inmate to have an appointment with an outside medical provider, the physician or the nurse noting the encounter would bring the note to the attention of the secretary responsible for coordinating outside medical visits.[12] [Nurse McCabe] did not work as a nurse for a physician who treated Plaintiff during

---

[12] "Noting" an encounter is when a nurse reviews the medical chart after the physician has seen an inmate to identify pertinent treatment and medications.

his time at Nottoway Correctional Center.  [Nurse McCabe] was therefore not responsible for noting [Mr.] Hunt's encounters with his physicians at Nottoway Correctional Center.

(ECF No. 125-2 ¶¶ 11–14 (paragraph structure and numbers omitted) (footnote number altered).)

As a Supervising Nurse, Nurse McCabe's duties included responding to inmate

grievances.  (ECF No. 125-2 ¶ 15.)

If an inmate filed a grievance claiming that he needed an outside medical visit, [Nurse McCabe] would bring this issue to the attention of the secretary responsible for coordinating outside medical visits.  The secretary would either schedule the appointment or, if the secretary advised [Nurse McCabe] that an outside visit could not be scheduled for any reason, then [Nurse McCabe] would advise the inmate to submit a request for sick call so he could speak to the physician. It was not [Nurse McCabe's] decision if there was an issue that prevented the scheduling of an outside appointment.

(ECF No. 125-2 ¶¶ 16–18 (paragraph structure and numbers omitted).  Nurse McCabe did not

have any authority to schedule outside medical appointments.  (ECF No. 125-2 ¶ 19.)

The Coronavirus-19 severely limited the number of outside appointments at Nottoway.

(ECF No. 125-2 ¶¶ 20–22.)

At the beginning of the Coronavirus-19 pandemic in 2020, all outside medical appointments were reviewed to determine if an outside appointment was a medical necessity.  Whether an outside appointment was a medical necessity was determined by the doctor at Nottoway and the outside provider.  During the Coronavirus-19 pandemic, virtual appointments were a main method used at Nottoway in place of outside medical appointments.

(ECF No. 125-2 ¶¶ 20–22 (paragraph structure and numbers omitted).)

## 2.   **Provision of Medications**

As a Registered Nurse, Nottoway's Nurse McCabe cannot unilaterally order medications.

(ECF No. 125-2 ¶ 23.)  He may only enter medication orders under the written direction of a

doctor.  (ECF No. 125-2 ¶ 23.)  As a Registered Nurse, Nurse McCabe did not "have the

authority to order or reorder thyroid medication for [Mr. Hunt]."  (ECF No. 125-2 ¶ 28.)  The

provisions for ordering medications at Nottoway are as follows:

The usual practice for entering a medication order is for the nurse that notes a doctor's order to be the nurse who enters the order into the computer system for the pharmacy. The only time that [Nurse McCabe] would enter a medication order would be where [he] had worked as the doctor's nurse and had noted the encounter. [Nurse McCabe] did not work as a nurse for a doctor who treated Plaintiff during his time at Nottoway Correctional Center. If a medication order came from a physician outside of the facility, the order was treated as a recommendation for the

Department of Corrections physician to use if he or she deemed it necessary for the offender's health.

(ECF No. 125-2 ¶¶ 24–27 (paragraph numbers and structure omitted).

As a Supervising Nurse, Nurse McCabe did not personally participate in the administration of Mr. Hunt's medication. (ECF No. 125-2 ¶ 29.) Nurse McCabe explains that:

If an inmate filed a grievance stating that he had not received medication, then [Nurse McCabe] would check the computer system to see the last date the inmate received his medication and to see if the medication order was still current. If the medication order was not current, [Nurse McCabe] would respond to the inmate grievance by stating that the inmate should sign up for sick call to ask the doctor to reorder the requested medication. If the medication order was current, [Nurse McCabe] would check with the pharmacy nurse to see if there was a medication card in the med room to issue to the inmate. If the requested medication card was present, [Nurse McCabe] would have the pharmacy nurse call for the inmate to come to the med room to pick up his requested medication card. If the medication order was current and there was no medication card available, [Nurse McCabe] would enter a refill request into the computer system for the off-site pharmacy to refill the medication card and send to Nottoway Correctional. [Nurse McCabe] would then respond to the inmate grievance that the medication has been reordered and to come to the med room in two to three days to pick up the requested medication.

(ECF No. 125-2 ¶¶ 30–33 (paragraph numbers and structure omitted).)

## IV. Analysis

To survive a motion for summary judgment on an Eighth Amendment claim, a plaintiff must demonstrate: "(1) that objectively the deprivation of a basic human need was 'sufficiently serious,' and (2) that subjectively the prison officials acted with a 'sufficiently culpable state of mind.'" *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). With respect to claims of inadequate medical treatment under the Eighth

Amendment, "the objective component is satisfied by a serious medical condition." *Quinones*, 145 F.3d at 167. A medical need is "serious" if it "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)); *see Webb v. Hamidullah*, 281 F. App'x 159, 165 (4th Cir. 2008) (citing *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)).

The subjective prong of an Eighth Amendment claim requires the plaintiff to demonstrate that a particular defendant actually knew of and disregarded a substantial risk of serious harm to his person. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. *Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Quinones*, 145 F.3d at 168 (citing *Farmer*, 511 U.S. at 837); *see Rich v. Bruce*, 129 F.3d 336, 338 (4th Cir. 1997). Thus, to survive a motion for summary judgment under the deliberate indifference standard, a plaintiff "must show that the official in question subjectively recognized a substantial risk of harm. . . . [and] that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997)).

16

### A.   <u>Alleged Indifference to Mr. Hunt's Need for an Endocrinology Appointment</u>

In Claim 1(b), Mr. Hunt claims that Nurse McCabe acted with deliberate indifference because "he never set a new appointment for plaintiff to go to Virginia Commonwealth University Hospital so could he start treatment on his thyroid." (ECF No. 18 ¶ 27(a).)  As noted previously, Mr. Hunt did not attend the October 3, 2019 appointment because he failed to change into the proper footwear.  Therefore, K. Woodson marked in Mr. Hunt's chart that he refused to attend the appointment.

As a Supervising Nurse, Nurse McCabe did not have any authority to schedule or reschedule outside medical appointments.  Rather, that authority initially rested with the treating physician and the nurse working with that physician.  Here, on January 30, 2020, a physician noted that Mr. Hunt needed a follow-up appointment with VCU endocrinology.  Therefore, either the physician, or the nurse working with that physician, was responsible for bringing the issue to the attention of the secretary responsible for scheduling outside appointments.  According to the record, that follow up appointment was scheduled, but then "was cancelled give[n] covid 19 crisis." (ECF No. 86-1, at 9.)

On March 11, 2020, Hunt submitted a grievance wherein he stated that "[m]onths ago" he was told he would be sent back to hospital for his Graves disease. (ECF No. 18-1 at 20.)  Nurse McCabe's review of Mr. Hunt's chart reflected that Mr. Hunt had refused his October 3, 2019 appointment and he needed to sign up for sick call to start the process over.  Given the information known to Nurse McCabe, such a response does not indicate indifference, but a reasonable effort on his part to get Mr. Hunt the treatment he desired. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001) (observing that defendant did not act with deliberate indifference "if he responded reasonably to the risk of which he knew" (citing *Farmer*, 511 U.S. at 844)).

By April of 2020, "all outside medical appointments were reviewed to determine if an outside appointment was a medical necessity. Whether an outside appointment was a medical necessity was determined by the doctor at Nottoway and the outside provider." (ECF No. 125-2 ¶¶ 20–21 (paragraph numbers and structure omitted).) Apparently, the doctor at Nottoway and Mr. Hunt's endocrinologist determined that an off-site visit and iodine radiation treatment were not a medical necessity for Mr. Hunt. Instead, on April 6, 2020, Mr. Hunt had a telemedicine appointment with his endocrinologist.

Following that appointment, neither the endocrinologist nor a physician at Nottoway concluded that Mr. Hunt needed to be returned to hospital for iodine radiation treatment. Rather, the endocrinologist and the physicians at Nottoway decided to treat Mr. Hunt's hyperthyroidism by managing his medications. Mr. Hunt had two more telemedicine appointments with his endocrinologist before he left Nottoway in January of 2021. At neither of those appointments, did the endocrinologist indicate that Mr. Hunt needed to return to the hospital to begin iodine radiation treatments. Rather, the notes from the November 19, 2020 appointment indicate that the endocrinologist believed surgery was the best option for treatment for Mr. Hunt and that the option had been presented to Mr. Hunt over a year ago.

Mr. Hunt fails to present evidence from which a reasonable jury could conclude that Nurse McCabe acted with deliberate indifference to his need to be sent to VCU for iodine radiation treatment. Mr. Hunt's October 3, 2019 appointment was cancelled because he failed to change into the required footwear. Thereafter, the physicians at Nottoway and Mr. Hunt's endocrinologist were responsible for determining whether to reschedule Mr. Hunt for iodine

radiation treatment and/or return him to VCU while he was confined at Nottoway.[13]  Mr. Hunt

fails to demonstrate that Nurse McCabe knew that a physician had ordered that Mr. Hunt be

returned to VCU for iodine radiation treatment and ignored that order.  The fact that Mr. Hunt

was not returned to VCU for iodine radiation treatment during his stay at Nottoway presents a

justifiable inference of a lack of an order from a physician/endocrinologist for such treatment,

rather than indifference on the part of Nurse McCabe.  Accordingly, Claim 1(b) lacks merit and

will be DISMISSED.

**B.    Provision of Hyperthyroid Medication**

In Claim 1(c), Mr. Hunt faults Nurse McCabe for failing to ensure that Mr. Hunt received

his thyroid medication.  Nurse McCabe does not dispute that Mr. Hunt had a serious medical

need for the provision of thyroid medication, or that there were occasional lapses in the provision

of this medication.  Instead, he contends that he did not act with deliberate indifference to Mr.

Hunt's need for thyroid medication.

Nurse McCabe was not responsible for the administration of Mr. Hunt's thyroid

medication.  As a Supervising Nurse, Nurse McCabe did not have the authority to order or

reorder Mr. Hunt's medication without an order from a physician.  Rather, Nurse McCabe's

primary responsibility with respect to medication was to respond to inmate grievances regarding

their medications.

As discussed below, none of the grievances and informal complaints reviewed by Nurse

McCabe individually or collectively put Nurse McCabe on notice that Mr. Hunt faced a

substantial risk of harm from lack of medication.  On August 27, 2019, Mr. Hunt submitted an

---

[13] Although in January of 2020, a physician at Nottoway recommended sending Mr. Hunt
to VCU for an appointment, that appointment was cancelled, by a physician, because of the
Coronavirus-19 pandemic.

informal complaint wherein he noted that his thirty-day prescription for thyroid medication had

lapsed, and that his nausea had returned.  On that same date, Mr. Hunt's prescription for

Tapazole was renewed.  By the time Nurse McCabe responded on September 11, 2019, Mr.

Hunt's medication orders had changed and Nurse McCabe informed Mr. Hunt he would be

switching to a self-medication regime.[14]  Nurse McCabe's actions here fail to demonstrate

deliberate indifference.

Next, on October 15, 2019, Nurse McCabe received an informal complaint from Mr.

Hunt, wherein he states:

> 10-3-19 I sign up [sic] for sick call informing the nurse to renew my thyroid
> meds and my thyroid which is chronic care.  That night I was not called for being
> seen.  The next day 10-4-19, during 9 pm count the officer informed me medical
> called for me, but I was in the shower, which after count was not allowed to go to
> medical.  10-7-19, I was sent a $5.00 copay of medical which I never was seen by
> medical and I [was] informed was for my thyroid "chronic care," and still need to
> be seen and my medication.

(ECF No. 18-1, at 14.)  On October 17, 2019, Nurse McCabe responded:

> On 10-3-19, you signed up for sick call for not being able to eat.  Also, on
> 10-3-19, you refused your MCV endocrinology clinic follow-up visit.  The
> appointment refusal was where the $5 medical co-pay change was assessed.

(ECF No. 18-1, at 14.)  According to Nurse McCabe's response, and Mr. Hunt's medical record,

(ECF No. 125-1 at 4), Mr. Hunt's October 3, 2019 sick call request pertained to Mr. Hunt's

complaint about eating, rather than any lack of medication.  Nurse McCabe then addressed Mr.

Hunt's complaint about the copay.  Nurse McCabe, however, did not address Mr. Hunt's last

comment that he needed his medication renewed.[15]  Nevertheless, the content of Mr. Hunt's

---

[14] When under self-medication regime, the individual is provided with a 30-day supply of medication.  He or she takes their daily dose of medication without requiring medical personnel assistance.  At the end of the 30-days, a prescription refill is provided.

[15] Such a lapse seems prompted by the justifiable inference that, according to what Nurse McCabe knew, Mr. Hunt had not requested a renewal of his thyroid medication in October of

informal complaint did not indicate the lack of medication was an emergency or posed a substantial risk of serious harm to his person. *See Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996) (emphasizing that claims of deliberate indifference predicated on a prison official's alleged inadequate response to an inmate's written complaint require the inmate to demonstrate "that the communication, in its context and manner of transmission, gave the prison official sufficient notice to alert him or her to 'an excessive risk to inmate health or safety.'" (quoting *Farmer*, 511 U.S. at 837)). In any event, as of October 22, 2019, Mr. Hunt began regularly receiving doses of his hyperthyroid medication, Methimazole, for self-administration. Accordingly, this interaction is insufficient to demonstrate deliberate indifference on the part of Nurse McCabe.

Nurse McCabe did not have any further interactions with Mr. Hunt concerning any lapses in his medication. Mr. Hunt has failed to present evidence from which a reasonable jury could conclude that Nurse McCabe acted with deliberate indifference to his need for thyroid medication. Accordingly, Claim 1(c) will be DISMISSED.

### V. Conclusion

For the reasons articulated above, the Supplemental Motion for Summary Judgment, (ECF No. 124), will be GRANTED. The action will be DISMISSED.

An appropriate Final Order shall issue.

Date: 7|3|2024
Richmond, Virginia

_____ /s/ _____
M. Hannah Lauck
United States District Judge

---

2019. Nevertheless, the better practice would have been for Nurse McCabe to direct to Mr. Hunt to sign up for sick call to get the doctor to reorder the requested medication. This observation, even read favorably to Mr. Hunt, does not suggest that this summary judgment motion should be denied.